J-S28035-23

2023 PA Super 173

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TERRANCE LAMONT SLOAN | : | |
| | : | |
| Appellant | : | No. 1483 WDA 2022 |

Appeal from the Judgment of Sentence Entered November 21, 2022
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0004092-2021

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:               **FILED:  September 21, 2023**

Appellant Terrance Lamont Sloan appeals from the judgment of sentence entered in the Court of Common Pleas of Westmoreland County following his conviction at a non-jury bench trial on the charges of driving while under the influence of a controlled substance ("DUI")-impaired ability-first offense, possession of a controlled substance (marijuana), possession of drug paraphernalia, exceeding the maximum speed limit by 33 mph, and careless driving.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested and charged with various drug and traffic offenses, including DUI.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 75 Pa.C.S.A. § 3802(d)(2); 35 P.S. §§ 780-113(a)(31) and (32); and 75 Pa.C.S.A. §§ 3362 and 3714, respectively.

Appellant filed a counseled pre-trial *omnibus* motion seeking to suppress the statements made by Appellant, as well as the evidence seized by the police, stemming from the stop of his motor vehicle on August 1, 2021. On May 9, 2022, Appellant, represented by counsel, proceeded to an evidentiary hearing on his motion to suppress.

At the suppression hearing, Pennsylvania State Police Trooper Stephen Rowe testified he was on routine patrol on August 1, 2021, and traveling on Route 22 in Salem Township in a marked police vehicle with his supervisor, Corporal Rebecca Fabich. N.T., 5/9/22, at 15-17. At approximately 3:06 a.m., he began following a vehicle and, clocking its speed for half a mile, he determined the vehicle was traveling at a "high rate of speed." *Id.* at 17. Specifically, he clocked the vehicle as traveling 78 miles per hour in an area properly posted at 45 miles per hour.[2] *Id.* at 18. The trooper testified the police vehicle's speedometer had been issued a certificate of accuracy on May 10, 2021, by Rabold Services.[3] *Id.* at 19-20. The trooper testified the speedometer was calibrated as a speed timing device within three months prior to the time of the instant motor vehicle stop. *Id.* at 22.

---

[2] The trooper clarified he followed Appellant's vehicle for several miles but clocked its speed for approximately half a mile. *Id.* at 22.

[3] The Commonwealth introduced evidence indicating the Department of Transportation's regulations list police vehicle speedometers as approved timing devices and Rabold Services as an approved testing center. *Id.* at 19.

Trooper Rowe testified that, due to the speeding violation, he initiated a stop of the vehicle. *Id.* He noted the driver, later identified as Appellant, initially stopped the vehicle "against the cement barrier in the median between the eastbound and westbound lanes with part of the vehicle being on the roadway" as opposed to pulling over to the right side of the road and stopping on the berm "where there was adequate room for everybody's safety." *Id.* at 22-23. Accordingly, the trooper exited his vehicle and, projecting his voice, asked Appellant to move his vehicle to a safer location, *i.e.*, a side road that connected to Route 22. *Id.* at 24. Trooper Rowe testified Appellant complied although he stopped the vehicle more in the "middle" of the side road instead of on the berm of the side road. *Id.* The trooper testified that Appellant's vehicle was now "off the main part of the state highway[,]" and he stopped the police vehicle, which had its overhead lights activated, directly behind Appellant's vehicle. *Id.* at 24-25.

Trooper Rowe testified that, at this point, he exited the police vehicle and approached Appellant's vehicle, which had its driver's side window rolled down. *Id.* at 25. As he did so, he "noticed the odor of burnt marijuana emanating from within the vehicle." *Id.* He noticed the burnt marijuana smell grew stronger as he walked closer to Appellant's vehicle. *Id.* at 26. Upon arriving at the driver's side window of Appellant's vehicle, Trooper Rowe identified himself, as well as requested Appellant's driver's license,

registration, and proof of insurance as "he normally does in every traffic stop." *Id.* at 25.

As the trooper interacted with Appellant, and Appellant searched for his documents, the trooper noticed Appellant had "redness of his eyes, bloodshot teary eyes, glossy eyes. When [Appellant] spoke with [the trooper,] it was in a slurred speech. Very slow but slurred." *Id.* at 26. The trooper recognized these as signs of possible intoxication from a controlled substance. *Id.* at 27. Appellant provided his license and registration to the trooper, but he was unable to locate his proof of insurance. *Id.* at 26.

Trooper Rowe testified that, as soon as he received Appellant's license and registration, he asked Appellant, who was alone in the vehicle, "where the marijuana was." *Id.* at 27. Appellant "referenced on the passenger seat, and [it] was a metal tin sitting on top of the seat. [Appellant] then opened up the tin which exposed a marijuana blunt." *Id.* The trooper noted Appellant opened the tin without the trooper asking him to do so, and as Appellant did so, Appellant stated, "I have my card, and I am permitted to take my medication[.]" *Id.* Appellant volunteered he "smoked 2 hours previous to the incident and that his doctor informed him that he had to wait at least an hour before he could drive after taking his medication." *Id.* at 33.

Trooper Rowe testified he understood Appellant to be referring to the fact he had a medical marijuana card. *Id.* at 27. However, the trooper testified the packaging of Appellant's marijuana in the tin was not consistent

with how medical marijuana is packaged. *Id.* at 28. He also noted Appellant's marijuana was in a "smoked blunt" form, which is not consistent with how medical marijuana is typically dispensed.[4] *Id.*

Trooper Rowe testified that, at this point, he asked Appellant to exit his vehicle to perform field sobriety tests. *Id.* at 29. He noted Appellant agreed, but his attitude became "more belligerent." *Id.* Appellant stood in front of and with his back to the police vehicle so that the area was well lit, but the lights were not in Appellant's eyes. *Id.* Trooper Rowe testified he began the field sobriety tests by holding a pen in front of Appellant, asking him if he could see the tip of the pen, and then asking Appellant to touch the tip of the pen with his right index finger. *Id.* at 30. Although Appellant indicated he could see the tip of the pen, he "touched his nose instead of the tip of the pen." *Id.*

Trooper Rowe indicated he explained and administered the "Lack of Convergence" test on Appellant, but Appellant's eyes "were unable to converge or, in other words, unable to cross when following the pen as instructed to do so." *Id.* at 30-31. The trooper indicated this was a sign that Appellant was under the influence of a controlled substance. *Id.* at 31. He next asked Appellant to "pull down on his lower eyelids," and the trooper observed "redness of his conjunctiva." *Id.* at 32. The trooper testified the

_____

[4] Trooper Rowe testified that, in his training and work experience, medical marijuana is typically dispensed in a pill or liquid form. *Id.* at 28.

sign of redness was an indicator Appellant was under the influence of a controlled substance. *Id.* He also noted he asked Appellant to stick out his tongue, and when he complied, Appellant's tongue had "a green, chalky substance over three quarters of the length and width of his tongue." *Id.* Based on his training, Trooper Rowe recognized this as an indication that Appellant "had smoked marijuana within the last four hours, but based on [the trooper's] observations and the amount of coverage on the tongue, it would have to be within the last hour or two." *Id.* at 32-33.

Trooper Rowe testified he then administered the Romberg Balance Test, which involved asking Appellant to close his eyes, tilt his head back, silently count to thirty, level his head, open his eyes, and tell the officer to stop counting in that time frame. *Id.* at 34. The trooper indicated he explained and demonstrated the test for Appellant. *Id.* Appellant indicated he understood the test and provided no reason as to why he would be unable to comply. *Id.* Nevertheless, Trooper Rowe testified that, during the test, Appellant had "tremors of his eyelids when they were closed and of his legs. He was also observed to have a 1 to 2 inch front-to-back sway and a 1 to 2 inch—or approximately 1 to 2 inch side-to-side sway." *Id.* He also noted that, instead of 30 seconds passing, 45 seconds passed before Appellant told the officer to stop the test. *Id.*

Concluding Appellant had failed the field sobriety tests, Trooper Rowe placed Appellant in the rear of the marked patrol vehicle, and he read

Appellant his implied consent and O'Connell warnings. *Id.* Trooper Rowe confirmed that, despite going over the implied consent form and O'Connell warnings with Appellant, Appellant verbally refused to give consent for any chemical testing, and he refused to sign the forms. *Id.* at 36. Trooper Rowe noted he removed the metal tin, which contained the marijuana blunt, from Appellant's vehicle. *Id.* at 37-38. He opined the metal tin was drug paraphernalia given that it was not a type of packaging used by a medical marijuana dispensary or otherwise from a licensed medical professional. *Id.* at 38.

Trooper Rowe testified that, based on his observations, training, and experience, Appellant was under the influence of a controlled substance when he was operating his vehicle. *Id.* at 39. He summarized the basis for his opinion as follows:

> Based on my personal observations, the odor of marijuana or burnt marijuana as I approached the vehicle, that same odor emanating from within the vehicle that [Appellant] was in, that same odor emanating from [Appellant's] person and breath after he exited the vehicle and while he was performing the field sobriety tests, the observations that I made of him to consist of the bloodshot glossy eyes, the slurred speech, the redness of the conjunctiva, again if I mentioned, the chalky substance on his tongue…It was my opinion that he was not capable of safe driving at this point.

*Id.* at 39-40.

On cross-examination, Trooper Rowe testified that, when he was following Appellant's vehicle, he saw no indication that Appellant's vehicle was "swerving" or "failing to maintain a lane[.]" *Id.* at 45. However, he again

reiterated that Appellant's vehicle was "going at a high rate of speed." *Id.* at 44. Trooper Rowe testified that glassy bloodshot eyes are consistent with the use of controlled substances, as well as alcohol; however, he smelled no alcohol during the traffic stop. *Id.* at 51. He also testified that certain medical conditions may cause red eyes, as well as lack of sleep. *Id.* at 52.

Trooper Rowe explained he received extensive training and education through the police academy regarding the indicators of marijuana use, and the amount of the green, chalky substance on Appellant's tongue is consistent with his training and experience that Appellant would have smoked marijuana "within the last hour to 2 hours" prior to the traffic stop. *Id.*

Trooper Rowe confirmed Appellant never indicated he had any physical ailment that would prevent him from completing the field sobriety tests. *Id.* at 53. He acknowledged that, aside from the single blunt of marijuana, he found no other marijuana in Appellant's vehicle. *Id.* He explained the marijuana at issue was loose marijuana "within the wrapper of [a] cigar wrapper itself forming the blunt." *Id.* at 54.

On redirect-examination, Trooper Rowe testified he did not call a drug recognition expert to the scene of the instant traffic stop because "with [his] training, education, and knowledge, and the amount that [he has] arrested over the course of [his] career, [he is] very comfortable based on [his] job knowledge as well as [his] training…to be able to ascertain if somebody is under the influence of a controlled substance." *Id.* at 55. Trooper Rowe

indicated that he never threatened Appellant nor showed him his gun. *Id.* at 56.

Trooper Rowe testified that, during the time he talked to Appellant while Appellant was in the driver's seat of his vehicle, Appellant was not under arrest. *Id.* at 57. He clarified he considered Appellant to be in custody after Appellant failed the field sobriety tests, at which point the trooper handcuffed Appellant and placed him in the back of the police vehicle. *Id.* at 56-57.

Trooper Rowe testified that, aside from obtaining the metal tin from the passenger seat, he neither searched nor seized any evidence from Appellant's vehicle. *Id.* at 58. On recross-examination, Trooper Rowe noted that Appellant never produced a medical marijuana card. *Id.* at 60.

Appellant testified that, during the traffic stop, he provided Trooper Rowe with all requested documents, including a medical marijuana card. *Id.* at 65. He noted the medical marijuana card is a photo ID, which was valid as of the time of the traffic stop. *Id.* Appellant testified he produced the medical marijuana card because, as soon as the trooper approached the vehicle, he informed Appellant he smelled burnt marijuana. *Id.* at 67.

Appellant testified that, during the traffic stop, he was "threatened" by Trooper Rowe. *Id.* at 66. In this regard, Appellant testified the trooper told him that "if [Appellant] was not going to go ahead and tell [the trooper] where [his] medical marijuana was that [he] was going to be charged with a DUI." *Id.*

On cross-examination, Appellant testified he was issued a medical marijuana card in February of 2021. *Id.* at 68. He indicated he usually consumes his medical marijuana with the use of a "vape pen" or "almost chewed like snuff." *Id.* He indicated his medical marijuana is packaged in a tin can, which contains a label. *Id.*

On re-direct examination, Appellant indicated his marijuana use has never left a chalky residue on his tongue. *Id.* at 69.

After receiving all evidence and testimony, on October 21, 2022, the trial court denied Appellant's motion to suppress. The parties stipulated to the trial court using the suppression notes of testimony for purposes of Appellant's non-jury bench trial, and, on October 21, 2022, the trial court convicted Appellant of all offenses set forth *supra*. Following a hearing, on November 21, 2022, Appellant was sentenced to an aggregate of seventy-two hours to six months in prison, to be followed by one year and thirty days of probation. This timely, counseled appeal followed, and all Pa.R.A.P. 1925(b) requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of the Questions Involved" (verbatim):

1. Whether the trial court erred by denying the Appellant's *omnibus* pre-trial motion to suppress evidence, for the reason that the evidence was discovered during the course of a traffic stop, which was unlawfully extended into an "investigative detention" without probable cause?

2. Whether the trial court erred in denying the Appellant's *omnibus* pre-trial motion to suppress statements, for the

- 10 -

reason that the said statements were obtained while he was in police custody, and without giving him Miranda warnings?

Appellant's Brief at 7 (unnecessary capitalization and suggested answers omitted).

In his first issue, Appellant contends the trial court erred in denying his pre-trial motion to suppress the physical evidence seized by Trooper Rowe. Specifically, he avers Trooper Rowe unlawfully extended the initial stop of his vehicle[5] and/or began a new investigative detention without reasonable suspicion.[6]

Initially, we note our standard of review of the denial of a motion to suppress evidence is as follows:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where…the appeal of the determination of the suppression court turns on allegations of

---

[5] Appellant does not dispute the propriety of the initial stop of his vehicle.

[6] In his "Statement of the Questions Involved," Appellant suggests probable cause is required for an investigative detention. However, in the argument portion of his brief, he concedes that an investigative detention needs to be supported by reasonable suspicion, which requires a lesser quantum of evidence than probable cause. **See Commonwealth v. Chase**, 599 Pa. 80, 960 A.2d 108 (2008).

- 11 -

legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the trial court are subject to plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. Also, it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

***Commonwealth v. Wright***, 224 A.3d 1104, 1108 (Pa.Super. 2019) (internal quotations, original brackets, and citations omitted).

Here, Appellant acknowledges the legality of the initial traffic stop for his speeding violation. ***See*** Appellant's Brief at 12-14. However, he claims that Trooper Rowe unlawfully extended the traffic stop and/or began a new investigative detention when he asked Appellant about the odor of burnt marijuana emanating from Appellant's vehicle and requested that Appellant perform field sobriety tests. In this vein, Appellant suggests the mere odor of burnt marijuana was insufficient to provide Trooper Rowe with the necessary reasonable suspicion to conduct a new investigative detention, and the trooper improperly extended the traffic stop seeking additional evidence to support a DUI.

We review Appellant's issue with the following legal precepts in mind.

During a traffic stop, the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. [I]f there is a legitimate stop for a traffic violation...additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions.

- 12 -

*Commonwealth v. Harris*, 176 A.3d 1009, 1020 (Pa.Super. 2017)

(quotations and quotation marks omitted).

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" - to address the traffic violation that warranted the stop and attend to related safety concerns.  Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are - or reasonably should have been - completed.

> [The Supreme Court has] concluded that the Fourth Amendment tolerates certain unrelated investigations that do not lengthen the roadside detention. [A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket….The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop.  [A police] officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.  [The police officer, however,] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

> Beyond determining whether to issue a traffic [citation, a police] officer's mission includes ordinary inquiries incident to the traffic stop. Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.  These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (citations, original brackets, and some quotation marks omitted).  *See Commonwealth v. Galloway*, 265 A.3d 810, 814-15 (Pa.Super. 2021) (discussing *Rodriguez* and holding "a police officer may use information gathered during an initial traffic stop to justify a second investigatory detention, regardless of whether

- 13 -

the officer has indicated at some point during the initial stop that the subject is free to leave"); *Commonwealth v. Malloy*, 257 A.3d 142 (Pa.Super. 2021) (discussing *Rodriguez*).

The "new detention" must be supported by reasonable suspicion. *See Commonwealth v. Smith*, 917 A.2d 848 (Pa.Super. 2007).

> To establish grounds for "reasonable suspicion"…the officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and the person he stopped was involved in that activity.
>
> In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight...to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Id.* at 852 (quotation marks and quotations omitted).

Recently, this Court held as follows in *Commonwealth v. Cunningham*, 287 A.3d 1, 9–10 (Pa.Super. 2022):

> Historically, Pennsylvania courts have held the smell of marijuana alone was sufficient to establish a reasonable suspicion of criminal activity. However, after the passage of the Medical Marijuana Act ("MMA")[7] and legalization of medical marijuana in the Commonwealth, our Supreme Court revisited this issue.
>
> In *Commonwealth v. Hicks*, 652 Pa. 353, 208 A.3d 916 (2019), our Supreme Court held that "conduct in which hundreds

---

[7] 35 P.S. § 10231.101 *et seq.*

- 14 -

of thousands of Pennsylvanians are licensed to engage lawfully" is, on its own, "an insufficient basis for reasonable suspicion that criminal activity is afoot." *Hicks*, *supra*, 208 A.3d at 945.

Further, in [*Commonwealth v.*] *Barr*, [___ Pa. ___, 266 A.3d 25 (2021)], our Supreme Court recognized that although "the MMA makes abundantly clear that marijuana no longer is *per se* illegal in this Commonwealth[,]" the possession of marijuana is still illegal under the Controlled Substance, Drug, Device and Cosmetic Act[8] "for those not qualified under the MMA." *Barr*, *supra*, 266 A.3d at 41. Accordingly, the Supreme Court held in *Barr* that "the odor of marijuana may be a factor, but not a stand-alone one, in evaluating the totality of the circumstances for purposes of determining whether police had probable cause to conduct a warrantless search." *Id.* In so holding, the Supreme Court explained:

> We emphasize that the realization that a particular factor contributing to probable cause may involve legal conduct does not render consideration of the factor *per se* impermissible, so long as the factor is considered along with other factors that, in combination, suggest that criminal activity is afoot. [T]he totality-of-the-circumstances analysis encompasses the consideration of factors that may arguably be innocent in nature.

*Id.* at 41-42.

This Court has had the opportunity to apply the *Hicks* and *Barr* decisions to various cases. In *Commonwealth v. Dabney*, 274 A.3d 1283, 1289 (Pa.Super. 2022), we assumed, *arguendo*, that *Barr* applies to a determination of reasonable suspicion for an investigative detention, and we held that the officer could consider the odor of raw marijuana, as well as other factors, in making that determination. In *Commonwealth v. Lomax*, No. 470 MDA 2021, 2022 WL 439087 (Pa.Super. filed Feb. 14, 2022) (unpublished memorandum),[9] we held the smell of fresh marijuana cannot objectively suggest anything more than

---

[8] 35 P.S. §§ 780-101-144.

[9] In *Cunningham*, we noted that, pursuant to Pa.R.A.P. 126(b), non-precedential decisions of this Court filed after May 1, 2019, may be cited for their persuasive value.

possession of a substance that many Pennsylvanians can legally possess. Therefore, we concluded that it cannot, on its own, establish the reasonable suspicion necessary to initiate an investigative detention.

More recently, in **Commonwealth v. Felder**, No. 1082 MDA 2021, 2022 WL 3210181 (Pa.Super. filed Aug. 9, 2022) (unpublished memorandum), we recognized the MMA does not permit the smoking of marijuana; therefore, the police's knowledge that the defendant had paraphernalia for smoking marijuana gave the officer reason to believe the marijuana was being used illegally. Also, in **Commonwealth v. Mercedes**, No. 1275 MDA 2021, 2022 WL 4392687 (Pa.Super. filed Sept. 23, 2022) (unpublished memorandum), we again recognized the MMA does not permit the smoking of marijuana. **See** 35 P.S. § 10231.304(b) ("It is unlawful to: (1) Smoke medical marijuana.").

Accordingly, we held the police had reasonable suspicion that marijuana was being illegally smoked when they smelled burnt marijuana and observed the defendant or his companion smoking a cigarillo. **See Mercedes**, **supra**.

**Cunningham**, 287 A.3d at 9-10 (footnotes added).[10]

In the case *sub judice*, in finding no merit to Appellant's suppression issue, the trial court concluded that, during the valid traffic stop for speeding and before the initial stop's purpose had been fulfilled, additional suspicion arose that Appellant was DUI such that Trooper Rowe legally detained Appellant to investigate the new suspicions. **See** Trial Court Opinion, filed

_____

[10] In **Cunningham**, we held a police officer had reasonable suspicion to conduct an investigatory detention where he smelled burnt marijuana, which grew stronger as he approached the defendant who was walking down the street, the defendant crossed the street in an effort to evade the officer, and when the officer asked to talk to the defendant, he became aggressive toward the officer and shouted profanities.

- 16 -

10/21/22, at 9-10. Specifically, the trial court relevantly indicated the following:

> [Whether an officer has] reasonable suspicion of criminal activity must be determined by examining the totality of the circumstances....To the extent that the vehicle stop turned into a [new] investigatory detention, there was reasonable suspicion [that arose before the initial stop's purpose had been fulfilled]. There was more than just the odor of marijuana. In addition to having witnessed the speeding, and the improper initial stop by the center median, Trooper Rowe, whom the [trial] court found to be a credible witness, noticed that [Appellant's] eyes were bloodshot and glassy and that his speech was slurred and slow. As an officer with his experience level, [Trooper] Rowe knew that these were physical indicators of someone who is under the influence of a controlled substance. Immediately after obtaining [Appellant's] driver and vehicle information, Trooper Rowe inquired as to the location of the marijuana [Appellant] had been smoking. [Appellant] gestured toward the metal tin on the passenger seat and admitted that he had consumed marijuana two hours before. Based upon Trooper Rowe's warranted suspicions, he asked [Appellant] to exit his vehicle and walk to the front of the patrol car to perform field sobriety tests. These resulted in even more observable indicators that [Appellant] was under the influence of a controlled substance.

Trial Court Opinion, filed 10/21/22, at 10 (citation omitted).

We find no abuse of discretion or error of law. Specifically, as the trial court found, when Trooper Rowe initiated the traffic stop for the speeding violation, he noticed Appellant did not safely pull his vehicle over to the right-side berm of the road; but rather, he stopped against the cement barrier on the left-hand side, resulting in part of his vehicle being in the left-hand lane. Appellant was able to follow the trooper's instructions to pull off to a safer location on a nearby side road; however, he stopped his vehicle more in the middle of the road as opposed to on the berm.

Thereafter, as the trooper approached Appellant (the driver and sole occupant), for the purpose of issuing a citation for speeding, he smelled the odor of burnt marijuana emanating from the vehicle. As this Court recognized in **Cunningham**, the MMA does not permit the smoking of medical marijuana. Thereafter, within the context of the "mission" of the initial traffic stop, Trooper Rowe asked Appellant for his driver's license, registration, and proof of insurance. **See Rodriquez**, **supra**; **Galloway**, **supra**; **Malloy**, **supra**. During this exchange, Trooper Rowe noticed Appellant's speech was slow and slurred, and additionally, Appellant's eyes were red, bloodshot, teary, and glossy. Trooper Rowe recognized these to be signs of intoxication from a controlled substance.

Accordingly, we conclude that, under the totality of the circumstances, and before the initial stop's purpose had been fulfilled, reasonable suspicion arose such that Trooper Rowe was permitted to investigate his new suspicions of DUI, including asking Appellant about his marijuana use and administering field sobriety tests. **See Harris**, **supra**. Thus, we agree with the trial court that there is no merit to Appellant's first suppression claim.

In his final issue, Appellant contends the trial court erred in denying his pre-trial motion to suppress his statements, which he made to Trooper Rowe. Specifically, Appellant avers he was subjected to custodial interrogation when Trooper Rowe asked him "where the marijuana was," and, thus, since

Appellant did not receive his **Miranda**[11] warnings prior to the question, Appellant's statements made thereafter should have been suppressed.  N.T., 5/9/22, at 27.

This Court has explained:

> Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of **Miranda** rights.  Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  The **Miranda** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  Thus, interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect.  In evaluating whether **Miranda** warnings were necessary, a court must consider the totality of the circumstances.

> Whether a person is in custody for **Miranda** purposes depends on whether the person is physically denied of his freedom of action in any significant way[,] or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation.  Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator.  Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted.

> Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. Thus, the ultimate inquiry for determining whether an individual is in custody for **Miranda** purposes is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

---

[11] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

*Commonwealth v. Gonzalez*, 979 A.2d 879, 887-88 (Pa.Super. 2009)

(citations, ellipses, brackets, and quotation marks omitted).

We have further stated:

The usual traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the conditions and duration of the detention become the functional equivalent of arrest. Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for *Miranda* purposes.

*Commonwealth v. Mannion*, 725 A.2d 196, 202 (Pa.Super. 1999) (*en banc*)

(citations omitted). "An ordinary traffic stop becomes 'custodial' when the

stop involves coercive conditions, including, but not limited to, the suspect

being forced into a patrol car and transported from the scene or being

physically restrained." *Id.* (citation omitted). To determine whether the

conditions of the detention are the functional equivalent of an arrest, the court

considers, "the basis for the detention; its length; its location; whether the

suspect was transported against his or her will, how far, and why; whether

restraints were used; whether the law enforcement officer showed, threatened

or used force; and the investigative methods employed to confirm or dispel

suspicions." *Id.* at 200.

In the case *sub judice*, in rejecting Appellant's claim, the trial court

relevantly held as follows:

[Appellant] was interrogated, but he was never in custody [prior to the trooper questioning him about the marijuana]. When he made the inculpatory statements about possessing marijuana, he had neither been placed in the patrol car nor removed from the traffic stop. He was sitting in his vehicle, complying with the

- 20 -

> statutory obligations imposed on drivers who violate the Motor Vehicle Code. The length of time he was interacting with the trooper was of short duration. He was never restrained [prior to the trooper questioning him about the marijuana] nor was he subjected to threats of use of force. Thus, [Appellant] was not entitled to the panoply of protections prescribed by *Miranda*, and his statements [were properly] not excluded.

Trial Court Opinion, filed 10/21/22, at 12.

We find no abuse of discretion or error of law. Specifically, as the trial court determined, under the totality of the circumstances, Appellant was not in custody, or the functional equivalent thereof, when the trooper asked him about the marijuana. *See Mannion*, *supra*. Trooper Rowe testified that, during the traffic stop, he asked Appellant about the marijuana as soon as he received Appellant's driver's license and registration. *Id.* At this time, Appellant was still seated in the driver's seat of his vehicle, and the trooper's questions were brief. *Id.* Moreover, Trooper Rowe testified he made no threats and did not display his weapon. *Id.*

Simply put, the trooper's question about the marijuana occurred during the course of an ordinary traffic stop, which was an investigative detention, and not at a time when the conditions/duration of the investigative detention became the functional equivalent of an arrest. *Id.* Accordingly, we agree with the trial court that Appellant's statements about the marijuana were not procured in violation of *Miranda*.

For all of the foregoing reasons, we find no merit to Appellant's suppression issues. Accordingly, we affirm his judgment of sentence.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  9/21/2023