J-S35034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANGEL LUIS ACEVEDO-GARCIA | : | |
| | : | |
| Appellant | : | No. 319 MDA 2025 |

Appeal from the Judgment of Sentence Entered February 5, 2025
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000249-2023

BEFORE: OLSON, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED: NOVEMBER 19, 2025**

Angel Luis Acevedo-Garcia ("Acevedo-Garcia") appeals from the judgment of sentence imposed following his convictions for persons not to possess a firearm, firearms not to be carried without a license, and driving while operating privilege is suspended.[1] After careful review, we affirm.

The parties do not dispute the evidence presented at the hearing on Acevedo-Garcia's motion to suppress. The trial court summarized:

> Officer Seth Arnold [("Officer Arnold") was] employed as a patrol officer with the Northwest Regional Police Department. He [was] a Northwest Regional patrolman for ten years and, in the course of his employment, . . . received trainings on subjects such as [driving under the influence], Advanced Roadside Impaired Driving Enforcement ("ARIDE"), criminal interdiction, drug interdiction, body language behaviors, and alibis.
>
> On December 6, 2022, . . . around 11:00 p.m., Officer Arnold was on patrol in a marked police vehicle observing

---

[1] **See** 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1); 75 Pa.C.S.A. § 1543(a).

westbound traffic on Route 283 in Mount Joy Township, Lancaster County, Pennsylvania. Officer Arnold observed a group of three vehicles come around a comer and watched the first vehicle[, a minivan,] dramatically slow down to the point that the other two vehicles went around [it]. As the lead car drove by, Officer Arnold observed that the minivan's window tint on the front windows appeared to be darker than was allowed, causing Officer Arnold to [follow] the vehicle and begin running the vehicle's registration. As Officer Arnold was running the vehicle's registration, the minivan made an abrupt and un-signaled exit off Route 283 onto the Cloverleaf Road exit. At this point, Officer Arnold turned on his cruiser's overhead lights and initiated the traffic stop at the end of the exit ramp.

Officer Arnold [made] a passenger's side approach and made contact with the driver and sole occupant of the vehicle, Acevedo-Garcia. The officer requested Acevedo-Garcia's driver's license, registration, and insurance[,] then[] explained that he [stopped him] due to his window tint and planned to issue [him] a warning. While Acevedo-Garcia collected the requested documentation, Officer Arnold inquired about Acevedo-Garcia's travel plans, asking where he was coming from and where he was going. Acevedo-Garcia explained that he lived in Reading and was headed to Harrisburg for work; however, seconds later, Acevedo-Garcia claimed that he was driving to Wawa because he was hungry.

After Acevedo-Garcia provided a Pennsylvania identification card and continued to search for the vehicle's registration and insurance, Officer Arnold asked Acevedo-Garcia to exit the vehicle and move to the front of the officer's cruiser so that he could begin issuing the warning. As Acevedo-Garcia exited the vehicle, Officer Arnold noticed a leather gun holster attached to the back of Acevedo-Garcia's waist. Consequently, as the officer and Acevedo-Garcia met at the back of the minivan, the officer asked to perform a pat-down search of Acevedo-Garcia for weapons. While conducting the pat-down search, Officer Arnold inquired about the gun holster, which Acevedo-Garcia claimed was a holster used to hold a flashlight. At the evidentiary hearing, the officer testified that based on his training and experience as a patrolman, that he knew the leather holster to be a gun holster. The officer's pat-down search yielded no weapons on Acevedo-Garcia's person.

At that point, Officer Good,[2] . . . arrived on scene and assisted Officer Arnold with the traffic stop. Officer Good provided Officer Arnold with a warning book and then proceeded to test the minivan's window tint[.] The window tint was found to be illegal, only allowing about [thirty percent] of light to pass through. While Officer Good tested the window's tint, Officer Arnold began to issue the warning and Acevedo-Garcia continued attempting to provide his proof of insurance. As Officer Arnold wrote the warning, he asked Acevedo-Garcia further questions to clarify his previous statements, asking where he lived and worked, the type of work he did, and if he had any criminal history. Acevedo-Garcia provided his address and explained his employment. Acevedo-Garcia then again stated that he was headed to Wawa because he was hungry. When Officer Arnold responded that he used to live near Harrisburg and . . . there [were] a multitude of Wawas around Reading but none near Harrisburg, Acevedo-Garcia explained that he had gone to a Sheetz earlier but had been dissatisfied with their portion sizes before changing the subject to his work. When Officer Arnold inquired as to whether Acevedo-Garcia had ever been arrested, Acevedo-Garcia replied that he had "for little kid stuff," which the officer confirmed meant acts committed as a juvenile.

[Four to five minutes after Officer Arnold began] to write the warning, Acevedo-Garcia finally provided his proof of insurance, at which point Officer Arnold returned to his police vehicle to verify Acevedo-Garcia's information. During his verification, the officer learned that Acevedo-Garcia's driving license was suspended, and his criminal history showed adult convictions for felony rape, resisting arrest, and felony grand larceny in New York. At the [suppression] hearing, the officer testified that upon learning of Acevedo-Garcia's felony conviction, he immediately knew that Acevedo-Garcia was a person not to possess a firearm.

Approximately twenty-three minutes after initiating the stop, Officer Arnold completed the written warning and returned [from] his police vehicle to Acevedo-Garcia. At this point, the officer requested permission to search Acevedo-Garcia's vehicle. After some back and forth, Acevedo-Garcia . . . denied consent to search the vehicle. In response, the officer informed Acevedo-Garcia that he would be requesting a canine ("K9") officer to come

---

[2] The certified record does not indicate Officer Good's first name.

- 3 -

and perform a sniff search of Acevedo-Garcia's vehicle. At the [suppression] hearing, the officer articulated that his suspicion to search Acevedo-Garcia's vehicle came from a number of circumstances, listing: the dramatic slowdown on the highway; the abrupt exit off the highway; the vehicle being registered out of Reading, a known source city for drugs; the vehicle being registered to a third party[, Acevedo-Garcia's wife]; the firearm holster; Acevedo-Garcia's possession and use of two cell phones; Acevedo-Garcia's deceptive behaviors, such as giving unsolicited information to change the subject; the observation of police memorabilia including handcuffs and a badge within Acevedo-Garcia's vehicle; multiple denominations of cash loose in the center console despite [his] having a wallet on his person; inconsistent travel plan stories; observation of gang memorabilia on Acevedo-Garcia's hat; Acevedo-Garcia's dishonesty concerning his criminal history and omission of his rape conviction; and behavioral observations during the traffic stop.

Within fifteen minutes of Officer Arnold's request, Officer Seidel[3] and K9 Arlo arrived on scene to perform the sniff sweep of the exterior of Acevedo-Garcia's vehicle. Officer Arnold and Officer Seidel had a brief conversation upon the K9's arrival regarding the situation, with Officer Arnold stating that he [was] leaning more towards the presence of a gun than drugs within the vehicle before he muted his bodycam to continue the conversation.

Moments later, during the sniff search, K9 Arlo alerted on the passenger side door of Acevedo-Garcia's vehicle. From there, the officer informed Acevedo-Garcia that because [K9] Arlo alerted[,] the vehicle would be towed and the officers would apply for a search warrant for the vehicle. At that point, the officers' detention of Acevedo-Garcia end[ed], and he [was] advised that he [was] free to leave.

[The officers discussed] the acquisition of a nighttime warrant. The on-call assistant district attorney was contacted and [they] granted permission to do a nighttime search warrant. After the vehicle was towed to the Northwest Regional Police Department, Officer Arnold drove to the on-call magisterial district judge [("MDJ")] to get the nighttime warrant signed[.] Officer

_____

[3] The certified record does not indicate Officer Seidel's first name.

> Arnold testified at the [suppression] hearing that the warrant was signed . . . around 2:45 a.m. on December 7, 2022, and that the search was executed at 3:10 a.m. that morning.

Trial Court Opinion and Order, 7/28/25, at 2-6 (unnecessary capitalization, citations, and footnote omitted).[4]

Upon executing the search warrant, the police found the following items in the vehicle: a Taurus semiautomatic pistol, several rounds of ammunition, several shooting targets, handcuffs, keys, and a clown mask.

The Commonwealth charged Acevedo-Garcia with firearms offenses and Vehicle Code[5] violations. Acevedo-Garcia filed a motion to suppress the evidence found in the vehicle. He conceded the initial vehicle stop was lawful but asserted the extended investigatory detention, canine sniff search, and search of his vehicle were illegal. The trial court held a suppression hearing, at which the Commonwealth presented one witness, Officer Arnold. Acevedo-Garcia did not testify or present any evidence on his own behalf. Following the submission of briefs by the parties, the trial court issued an order and opinion denying the motion to suppress.

On November 11, 2024, Acevedo-Garcia proceeded with a stipulated bench trial. The trial court found him guilty of persons not to possess a firearm, firearms not to be carried without a license, and driving while

---

[4] For ease of review, when quoting the trial court's opinion, we have changed the references to the "Defendant" to "Acevedo-Garcia."

[5] *See* 75 Pa.C.S.A. §§ 101-9805.

- 5 -

operating privilege is suspended. On February 5, 2025, the trial court imposed an aggregate sentence of five to ten years' incarceration.

Acevedo-Garcia filed a timely notice of appeal. Both the trial court and Acevedo-Garcia complied with Pa.R.A.P. 1925.

Acevedo-Garcia presents three issues for our review:

I.   Did the trial court err in denying [] Acevedo-Garcia's motion to suppress where the police officer did not possess the required reasonable suspicion to believe that criminal activity was afoot in order to extend the lawful traffic stop into an investigative detention, in violation of the Fourth Amendment [to] the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution and therefore, any contraband or items found on his person, property or in the vehicle searched should have been suppressed as the fruit of the illegal seizure?

II.  Did the trial court err in denying [] Acevedo-Garcia's motion to suppress where the police officer did not possess the required reasonable suspicion that drugs may be present in the vehicle to support a canine sniff of the vehicle in violation of the Fourth Amendment [to] the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution and therefore, any contraband or items found on his person, property or in the vehicle searched should have been suppressed as the fruit of the illegal seizure?

III. Did the trial court err in denying [] Acevedo-Garcia's motion to suppress where the officers conducted an illegal, warrantless search of [] Acevedo-Garcia's vehicle, absent any exigent circumstances and without his consent in violation of the Fourth and Fourteenth Amendments [to] the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution, and therefore, any contraband or items found on his person, property or in the vehicle searched should have been suppressed as the fruit of the illegal seizure?

Acevedo-Garcia's Brief at 4-5 (unnecessary capitalization omitted).

In Acevedo-Garcia's first issue, he argues that Officer Arnold unlawfully extended the initial traffic stop into an investigative detention without reasonable suspicion. In our review of an order denying a pretrial motion to suppress, we note

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the trial court are subject to plenary review.
>
> Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. Also, it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Sloan*, 303 A.3d 155, 162–63 (Pa. Super. 2023).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures. *See Commonwealth v. Thompson*, 289 A.3d 1104, 1107 (Pa. Super. 2023). Pennsylvania courts recognize "three levels of interaction between the police and citizens: (1) a mere encounter, (2) an investigative

detention, and (3) a custodial detention." ***Commonwealth v. Spence***, 290

A.3d 301, 314 (Pa. Super. 2023) (citation omitted).

> As this Court has stated:
>
> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.
>
> In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

***Id***. (citations omitted and paragraph break added).

> To establish grounds for "reasonable suspicion" . . . the officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and the person he stopped was involved in that activity.
>
> In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Sloan***, 303 A.3d at 164 (citation omitted).

It is "settled law that a motor vehicle stop is generally a second-level interaction, an investigative detention." **Spence**, 290 A. 3d at 314. Furthermore, this Court has explained:

> A police officer has the authority to stop a vehicle when he or she has **reasonable suspicion** that a violation of the [V]ehicle [C]ode has taken place, for the purpose of obtaining necessary information to enforce the provisions of the [C]ode. 75 Pa.C.S.A. § 6308(b). However, if the violation is such that it requires no additional investigation, the officer must have **probable cause** to initiate the stop.

**Id**. at 312 (some citations omitted).

Once police lawfully stop a vehicle for a Vehicle Code violation, they may not extend the stop beyond the time necessary to complete the purpose of the stop — such as issuing a citation or warning — unless they develop reasonable suspicion that additional criminal activity is afoot. **See Commonwealth v. Galloway**, 265 A.3d 810, 814-15 (Pa. Super. 2021).

Acevedo-Garcia concedes the initial traffic stop for illegal window tint was lawful[6] but argues that Officer Arnold unlawfully extended the stop after completing its purpose. Acevedo-Garcia contends that once the officer verified his documents, issued written warnings, and found no weapons or contraband during a pat-down, the mission of the stop had concluded. Acevedo-Garcia asserts that Officer Arnold lacked reasonable suspicion to continue detaining him, emphasizing that there was no odor nor evidence of drugs, and no safety

___

[6] The Vehicle Code governs the permissible amount of window tinting. **See** 75 Pa.C.S.A. § 4524(e)(1), (2)(i)-(ii).

concern. Acevedo-Garcia claims the officer's reliance on an empty holster and inconsistent travel explanations amounted to a "fishing expedition[,]" not articulable suspicion. Acevedo-Garcia's Brief at 22.

Acevedo-Garcia relies on **Commonwealth v. Malloy**, 257 A.3d 142 (Pa. Super. 2021), in which this Court ultimately held that an officer's suspicion of passenger's possession of a firearm was insufficient to prolong a vehicle stop based on a lack of a license plate. Acevedo-Garcia maintains that Officer Arnold's continued questioning and request to search, after the vehicle stop had concluded, constituted an illegal investigative detention, and the trial court should have suppressed all evidence obtained thereafter as the fruit of the poisonous tree.

The trial court concluded that Officer Arnold had reasonable suspicion to extend the stop beyond its initial purpose. In its opinion, the trial court reasoned:

> In the instant matter, [Officer Arnold] possessed sufficient reasonable suspicion to extend the traffic stop. ·The legality of the initial traffic stop is not in dispute in this matter and was supported by the officers' finding that Acevedo-Garcia's window tint was illegal. The initial traffic stop was delayed primarily, if not solely, by Acevedo-Garcia's own lethargic provision of the requested documentation[,] namely, his proof of insurance and vehicle registration. . . .
>
> The court finds that at the moment that [Officer Arnold completed writing the warnings] and returned to Acevedo-Garcia outside the police vehicle, the initial traffic stop had concluded. The officer also testified that the initial purpose of the stop had been fulfilled at that moment.

> When [Officer Arnold] asked for consent to search the vehicle, the traffic stop transitioned into a secondary investigatory detention, for which the court finds that the officer possessed sufficient reasonable suspicion. The officer listed numerous factors that generated his reasonable suspicion that criminal activity was afoot including Acevedo-Garcia's inconsistent and seemingly illogical explanations of his travel plans; Acevedo-Garcia's dishonesty regarding both his criminal history and the gun holster; Acevedo-Garcia's point of origin being Reading, a city known to the officer as a source of drugs; and Acevedo-Garcia's initial dramatic slowdown on and abrupt un-signaled exit off the highway. The officer testified that upon learning Acevedo-Garcia's criminal history that he knew Acevedo-Garcia would be a person not to possess a firearm and had reasonable suspicion that Acevedo-Garcia was at least engaged in that specific criminal activity.

Trial Court Opinion, 7/29/25, at 8-9 (citations omitted).

Upon review, we discern no error in the trial court's conclusion that Officer Arnold possessed reasonable suspicion to extend the traffic stop into an investigative detention. The record supports the suppression court's factual findings, and its legal determinations are sound. *See Sloan*, 303 A.3d at 162–63.

First, we observe that Acevedo-Garcia wholly fails to address the trial court's discussion that it was his own "lethargic" gathering of the requested documentation that prolonged the vehicle stop. Trial Court Opinion, 7/29/25, at 8. Acevedo-Garcia does not dispute that from the time Officer Arnold asked for his driver's license, car registration, and insurance to when he provided it, Officer Arnold was able to ask him about his travel plans, and Acevedo-Garcia stated he was going to Harrisburg for work, then claimed he was going to

Wawa. As noted above, these inconsistent statements contributed to Officer Arnold's reasonable suspicion that criminal activity was afoot.

In any event, the record shows that Officer Arnold observed multiple factors which, viewed collectively and in light of his training and experience, provided a particularized and objective basis for suspecting that criminal activity was afoot. These factors included: (1) Acevedo-Garcia's abrupt and un-signaled exit from the highway after noticing the patrol vehicle; (2) the presence of a firearm holster on his waistband; (3) his inconsistent and implausible explanations for travel; (4) his concealment of his prior felony conviction; and (5) his origin from Reading, which the officer identified as a known source city for narcotics. In particular, Acevedo-Garcia ignores the trial court's reasoning that: (1) during the initial vehicle stop, Officer Arnold observed that he wore a gun holster; (2) the officer then surmised, despite Acevedo-Garcia's misrepresentation of his criminal history, that due to prior felony convictions, he was prohibited from possessing a firearm; and thus (3) the officer now had reasonable suspicion to suspect additional criminal activity was afoot. The totality of each of these circumstances gives rise to reasonable suspicion warranting further investigation. *See Sloan*, 303 A.3d at 164.

Furthermore, we are unpersuaded by Acevedo-Garcia's reliance on *Malloy*, 257 A.3d 142. In *Malloy*, a police officer legally stopped a vehicle for a missing license plate. *See id*. at 145. During the stop, the officer asked the defendant, Malloy, a passenger, for identification. *See id*. When Malloy

produced a lanyard, the officer inquired whether he had a firearm, explaining that in his experience, individuals "who worked in armed security positions at local bars" often carried their identification badges on lanyards. *Id*. Malloy confirmed he had a firearm and worked as a security guard at a bar. *See id*. The officer secured the firearm for safety and then questioned Malloy about his firearm licensure. *See id*. at 146. Malloy produced an expired Act 235 card, which would have authorized him to carry the firearm as a part of his employment. *See id*. After verifying that Malloy lacked a valid license to carry, the officer arrested him. *See id*. Subsequently, a trial court found him guilty of firearms offenses. *See id*.

On appeal, this Court concluded the officer unlawfully prolonged the initial traffic stop by ordering a passenger to produce documentation confirming his right to carry a firearm. *Malloy*, 257 A.3d at 154-55. We held such a request was not "an ordinary inquiry incident to the traffic stop." *Id*. at 152. We reasoned:

> [N]either the trial court nor the Commonwealth offer[ed] any explanation as to how or why a passenger's firearms licensure status relate[d] to . . . to the safe and financially responsible operation of a motor vehicle in general. We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured. . . .
>
> * * * *
>
> . . . Before issuing this request, [the officer] possessed no evidence showing that [Malloy] was involved in criminal activity[ or] had engaged in furtive movements, that recent gun-related

- 13 -

criminal activity had occurred in the vicinity of the stop, or that criminal activity (apart from an improperly displayed license plate) had taken place in the vehicle in which [Malloy]was traveling as a passenger. In addition, neither the trial court nor the Commonwealth points to evidence linking [Malloy] to criminal activity or furtive movements prior to Officer Henry's request [for] documentary proof that he was authorized to carry a firearm.

*Malloy*, 257 A.3d at 152, 154.

Here, by contrast, several independent and articulable observations supported Officer Arnold's renewed detention of Acevedo-Garcia. Whereas there was no evidence in *Malloy* to support a reasonable suspicion that the passenger engaged in any criminal activity, here, Officer Arnold cited several observations unrelated to the reason for the initial traffic stop, the tinting of Acevedo-Garcia's windows. As stated above, the officer listed "Acevedo-Garcia's initial dramatic slowdown on and abrupt un-signaled exit off the highway," his "inconsistent and seemingly illogical explanations of his travel plans[, and] dishonesty regarding both his criminal history and the gun holster." Trial Court Opinion, 7/29/25, at 9. Additionally, "upon learning Acevedo-Garcia's criminal history[, Officer Arnold believed that ] Acevedo-Garcia would be a person not to possess a firearm." *Id*. Thus, the reasoning in *Malloy* does not compel suppression under these facts.

Considering the totality of the circumstances and affording due weight to the officer's reasonable inferences drawn from his experience, we conclude that the record supports the trial court's finding that Officer Arnold possessed

reasonable suspicion to justify the brief extension of the stop for further investigation. Thus, Acevedo-Garcia's first issue is without merit.

In Acevedo-Garcia's second issue, he argues that Officer Arnold unlawfully prolonged the traffic stop to conduct a canine sniff search without reasonable suspicion that drugs were present, rendering the subsequent search and seizure unconstitutional.

> A canine sniff is a search pursuant to Article I, Section 8 of the Pennsylvania Constitution. However, because this type of search is inherently less intrusive upon an individual's privacy than other searches, our Supreme Court has held that police do not need probable cause to conduct a canine search of a place. Rather, the police need merely have reasonable suspicion for believing that narcotics would be found in the place subject to the canine sniff.

*Commonwealth v. Green*, 168 A.3d 180, 186 (Pa. Super. 2017) (quotation marks, citations, and footnote omitted). Under the totality of the circumstances, factors such as a driver's nervous behavior, inconsistent statements, fraudulent documentation, and the presence of items commonly associated with drug activity may collectively establish reasonable suspicion to justify a canine sniff of a vehicle's exterior. *See Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004). As stated above, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Id*.; *see also Sloan*, 303 A.3d at 164.

Acevedo-Garcia argues that Officer Arnold lacked reasonable suspicion to justify the canine sniff. He asserts that the officer had no articulable basis to believe narcotics were present because there was no odor of drugs

"emanat[ing] from the vehicle or [his] person." Acevedo-Garcia's Brief at 24.

Acevedo-Garcia further notes that the prior pat-down revealed no contraband, and Officer Arnold admitted he did not have "anything specific" to indicate that drugs were present. *Id*. Acevedo-Garcia contends that after he "exercised his right to decline a search[,]" Officer Arnold called for a canine trained only to detect narcotics, not firearms. *Id*. Acevedo-Garcia emphasizes that Officer Arnold stated in a body cam recording with the canine officer that he suspected the presence of a gun rather than drugs. He contends the officer then muted the recorder because he did not want to record evidence of a "fishing expedition." *Id*. at 25. Thus, Acevedo-Garcia maintains the trial court should have suppressed all evidence obtained as "fruit of the unlawful tree." *Id*. at 25-26.

In its opinion, the trial court reasoned:

> When Acevedo-Garcia denied [Officer Arnold] permission to search his vehicle, the officer's reasonable suspicion did not dissipate but, instead, justified the officer's next step of requesting a canine unit to perform a sniff sweep of the vehicle. Acevedo-Garcia points largely to a conversation caught on Officer Arnold's bodycam between the officer and Officer Seidel in which Officer Arnold states that he believes there is likely a gun present in the vehicle and what next steps to take if K9 Arlo did not alert on the vehicle. Regardless of the officer's subjective belief of what ***type*** of criminal activity was afoot, the determination of whether an officer's suspicion of criminal activity is reasonable is an ***objective*** determination. [T]he legality of an investigatory detention relies upon [the totality of the circumstances] providing a reasonable officer with an objectively reasonable belief that criminal activity was afoot. The court finds that the officer articulated specific facts which would provide a reasonable officer with a reasonable suspicion of criminal activity. Further, the canine unit arrived within fifteen minutes of the request, which the court finds is not

- 16 -

an unreasonable delay in the execution of the secondary investigatory detention.

Trial Court Opinion, 7/29/25, at 9-10 (emphasis in original, citations omitted).

Based upon the evidence presented at the suppression hearing, we conclude that record supports the trial court's factual findings and its legal conclusions. *See Sloan*, 303 A.3d at 162–63. The trial court properly found that: (1) there was reasonable suspicion to justify a canine sniff search; (2) the subsequent search did not violate Article I, Section 8 of the Pennsylvania Constitution; and (3) the evidence obtained was properly admissible.

Considering the totality of the circumstances, the record reflects multiple indicators supporting Officer Arnold's objectively reasonable basis to suspect illegal activity, including: the vehicle being registered out of Reading, a known source city for drugs, and Acevedo-Garcia's wife; the presence of a firearm holster on Acevedo-Garcia's person; his possession of two cell phones; deceptive behaviors such as offering unsolicited information to change the subject; police memorabilia, handcuffs, and a badge observed in the vehicle; multiple denominations of cash in the center console despite having a wallet; inconsistent travel plans; gang memorabilia on Acevedo-Garcia's hat; dishonesty regarding his criminal history, including omission of a prior rape conviction; and behavioral observations during the traffic stop. *See Rogers*, 849 A.2d at 1189. Although Officer Arnold's body cam recorded his suspicion that a firearm, rather than drugs, was present, the relevant inquiry is objective — whether the facts known to the officer would lead a reasonable officer to

- 17 -

suspect any criminal activity. The trial court correctly concluded that the articulated facts justified the canine sniff. Moreover, the fifteen-minute wait for the arrival of the canine unit did not constitute an unreasonable delay. Thus, Acevedo-Garcia's second issue is without merit.

In Acevedo-Garcia's third issue, he argues that the trial court erred in denying his motion to suppress because the search of his vehicle was illegal and unconstitutional due to an error on the face of the search warrant indicating the time of issuance. "Pennsylvania courts have long held that a technical defect in a warrant, such as . . . mis-dating . . . does not render a warrant invalid in the absence of a showing of prejudice." **Commonwealth v. Benson**, 10 A.3d 1268, 1274 (Pa. Super. 2010) (citation omitted). "An error in a warrant is fatal only if it deprives a reviewing court of the ability to review the propriety of the issuance and execution of the warrant." **Id**. (*quoting* **Commonwealth v. Begley**, 780 A.2d 605, 641 (Pa. 2001)).

Acevedo-Garcia argues that the search was illegal because the police executed it at 3:10 a.m., hours before the MDJ signed the warrant at 7:45 a.m., as reflected on the face of the warrant. Acevedo-Garcia contends there was no valid warrant at the time of the search and that the trial court should have suppressed any evidence obtained as fruit of the poisonous tree.

The trial court concluded:

> Acevedo-Garcia claims that the . . . search of the vehicle was conducted prior to [Officer Arnold's] acquisition of the warrant. To support this claim, Acevedo-Garcia points to what the court determines is no more than sloppy handwriting by the [MDJ] in

which the "2" in "2:41 a.m." appears to more closely resemble a "7." The court finds that in viewing the warrant application in its entirety, it is quite obvious that the "2 or 7" debate comes down to a lackluster penmanship performance by the MDJ, as other places in the document, such as the line for the Magisterial District Number, where a "2" is clearly required, ["2s"] are written in a manner resembling a "7," where a "7" would be improper and nonsensical. The court's finding is also buttressed by the officer's credible testimony that the warrant was signed around 2:45 a.m., after his consultation with the nighttime on-call assistant district attorney and before the execution of the search at 3:10 a.m. that same morning. Accordingly, the court finds Acevedo-Garcia's argument that the search was conducted prior to the acquisition of the warrant meritless.

Trial Court Opinion, 7/29/25, at 10 (citations omitted).

Upon our review of the record, we conclude that the trial court did not err in denying Acevedo-Garcia's motion to suppress. On appeal, he wholly fails to address the trial court's reasoning, that any dispute over the timing of the search warrant was attributable simply to handwriting. Acevedo-Garcia also ignores that the trial court credited Officer Arnold's testimony that the MDJ issued the warrant around 2:45 a.m. This credibility determination is binding on this Court. *See Sloan*, 303 A.3d at 163. Furthermore, Acevedo-Garcia presented no evidence at the suppression hearing and has failed to demonstrate he suffered any prejudice as a result. *See Begley*, 780 A.2d at 641; *see also Benson*, 10 A.3d at 1274. Thus, Acevedo-Garcia's third claim is without merit.

For the foregoing reasons, we determine that none of Acevedo-Garcia's issues merit relief. Accordingly, we affirm his judgment of sentence.

Judgment of sentence affirmed.

- 19 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/19/2025</u>