788 A.2d 976 (2001)
In the Interest of V. H., a Minor
Appeal of Commonwealth of Pennsylvania.
Superior Court of Pennsylvania.
Submitted June 25, 2001.
Filed November 16, 2001.
Reargument Denied January 25, 2002.
*978 Michael W. Streily, Asst. Dist. Atty., Pittsburgh, for the Com., appellant.
Philip A. Ignelzi, Pittsburgh, for appellee.
Before: DEL SOLE, President Judge, McEWEN, President Judge Emeritus, and POPOVICH, J.
*977 POPOVICH, J.
¶ 1 The Commonwealth appeals from the suppression court's order entered on December 7, 2000, granting V.H.'s motion to suppress oral statements made by him to detectives of the City of Pittsburgh.[1] We reverse and remand for a trial.
¶ 2 The standard of review has been stated recently by this Court in Commonwealth v. Mannion, 725 A.2d 196, 198 (Pa.Super.1999) (en banc); to-wit:
When reviewing an appeal from a suppression court's decision, we must first determine whether the record supports the court's factual findings. Commonwealth v. Williams, 539 Pa. 61, 71, 650 A.2d 420, 425 (1994). When the Commonwealth appeals from a suppression court's decision, we consider only the evidence of the defendant's witnesses and so much of the prosecution's evidence that remains uncontradicted when fairly read in the context of the record as a whole. Commonwealth v. Prosek, 700 A.2d 1305, 1307 (Pa.Super.1997). We are bound by the suppression court's factual findings when the evidence supports those findings; however, we may reverse the suppression court when it draws erroneous legal conclusions from those factual findings. Williams, 539 Pa. at 71-71, 650 A.2d at 426.
¶ 3 The record reflects the following facts: Pittsburgh Detectives Scott Evans and Richard Ruffalo received information that the sixteen (16) year old appellee "may have been an individual ... involved" in a fire in the Swisshelm Park portion of the city on July 8, 2000. This came about as a result of a "door-to-door" inquiry of the residents in the area.
¶ 4 At first, the detectives left their card with a person by the name of "Chad" at the appellee's residence. This prompted a phone call from the appellee's mother at approximately 9:00 p.m. on the 9th of July, 2000, that her son was at home. The police accepted the mother's invitation to talk to the appellee at home. Once there, the detectives were seated in the dining room with the appellee and his parents.
¶ 5 The detectives advised the appellee and his parents of the information gathered, who provided it and the purpose of their visit, i.e., "to talk to their son about the information that [the police] had [concerning the fire]."[2] N.T., Suppression Hearing, 11/14/00 at 17. The police also recalled informing the parents:
... we needed their permission to do so. So we [sic-they] granted their permission.... We all sat down at the table and [V.H.] gave us a statement as to what he did that night in question.

* * * *
He told us he was at the park in question. He told us he was there from *979 between 9:30 to 10:30 in the evening the night the fire occurred, then he came home with a friend of his by the name of Chad, and I believe theyChad was staying with his parents at that time. I recall that his mother had said, you know, I know that to be true, because he was home, and then I locked the door. I know my kid was home when this door was locked.
Later on in the conversation, [V.H.]changed his story and said that he had, in fact, left the house after he had came back, and then when he left the house, he was picked up by two friends that were girls, and he talked with the two friends and went to theto a party in the Greenfield area, and after that, they returned, I believe he said approximately 1:00 in the morning. And I specifically recall [V.H.] saying when he was bringingwhen they were bringing him back, that he saw the fire trucks there and the fire trucks were putting the fire out at this time, or he may have said the trucks were pulling up, but he made a statement about seeing the fire trucks there in the park.
N.T., Supression Hearing, 11/14/00 at 18-19.
¶ 6 The interview lasted 30-40 minutes, during which time the parents remained in the company of their son and the police. Additionally, the police informed Mr. and Mrs. H. and their son that they were in the process of gathering information, and any given by V.H. would be submitted to the District Attorney's Office.
¶ 7 Thereafter, the appellee was arrested and charged with Arson, Criminal Conspiracy and Criminal Mischief. A hearing was held to suppress his statements on grounds that his rights under the United States Constitution and Pennsylvania Constitution were violated. The court granted the suppression on the basis that:
Appellee was clearly a suspect of the police. After contacting Appellee's parents, the police were invited to the home for the purpose of conducting an interview. It is uncontroverted that Appellee's statements were "calculated to elicit incriminating statements", and were procured without Miranda warnings. Given the foregoing, it was the conclusion of the Court that the minor Appellee, upon learning that his parents had invited the police to the home for questioning, and then undergoing questioning by the police in the presence of both parents, would have "reasonably believed" that he was not free to exit the room or home or otherwise impede the interview. Accordingly, the interview was custodial in nature.
Suppression Court Opinion, 3/22/01 at 6-7 (citation omitted). We disagree with the legal conclusion drawn by the court that the interview was custodial in nature. On the contrary, we find that the facts do not support the determination made by the court to suppress the appellee's statements. Mannion, supra.
¶ 8 The United States Supreme Court has stated its position on custodial interrogation, and the concomitant requirement of the recitation of Miranda warnings, under the U.S. Constitution in Stansbury v. California, 511 U.S. 318, 322-323, 114 S.Ct. 1526, 1528-1529, 128 L.Ed.2d 293 (1994) (citations omitted); to-wit:
We held in Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] that a person questioned by law enforcement officers after being `taken into custody or otherwise deprived of his freedom of action in any significant way' must first `be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained *980 or appointed.' ... An officer's obligation to administer Miranda warnings attaches, however, `only where there has been such a restriction on a person's freedom as to render him `in custody.' In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but `the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'
Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. In Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), for example, the defendant, without being advised of his Miranda rights, made incriminating statements to Government agents during an interview in a private home. He later asked that Miranda `be extended to cover interrogation in non-custodial circumstances after a police investigation has focused on the suspect.' 425 U.S., at 345, 96 S.Ct., at 1615[ ]. We found this argument unpersuasive, explaining that it `was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the Miranda requirements with regard to custodial questioning.' Id., at 346-347, 96 S.Ct., at 1616[ ]. As a result, we concluded that the defendant was not entitled to Miranda warnings: `Although the "focus" of an investigation may indeed have been on Beckwith at the time of the interview ..., he hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding.'
Accord Commonwealth v. Busch, 713 A.2d 97, 100 (Pa.Super.1998) (Pennsylvania law is in harmony with Beckwith).
¶ 9 Accordingly, we need to ascertain whether the appellee was "in custody" so as to activate his right to Miranda warnings during the July 9, 2000, interview.
It is well-settled that the police are only required to advise a person of his Miranda rights if that person is subjected to custodial interrogation.
The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate Miranda warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.
In Commonwealth v. Ellis, 379 Pa. Super. 337, 549 A.2d 1323 (1988), appeal denied, 522 Pa. 601, 562 A.2d 824 (1989), this court noted, "Indeed, police detentions only become `custodial' when under the totality of circumstances the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest."
Among the factors the court utilizes in determining, under the totality of the circumstances, whether the detention became so coercive as to constitute the functional equivalent of a formal arrest are: the basis for the detention; the duration; the location; whether the suspect was transferred against his will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions. *981 Busch, 713 A.2d at 100-101 (citations omitted).
¶ 10 Applying the principles recited in Stansbury and Busch, we note that the appellee was interviewed in his home on one occasion, which was "permitted" at the invitation of his parents and in their company during a 30-40 minute session with police. The detectives prefaced their investigation with a caveat to the parents and the appellee outlining the purpose of the visit, the disclosure of the data gathered concerning the fire, the source of the information and the fact that they were expanding the inquiry to encompass the appellee because his name surfaced during the investigation.
¶ 11 Further, the police cautioned that they needed the permission of the parents before they could make inquiry of the appellee. This was obtained in advance of any questioning, which lasted less than one hour, took place in the dining room and occurred under the watchful eye of the appellee's parents, who, interestingly enough, voiced no objection to the course of the discussion or the content of what was asked and answered by the participants.
¶ 12 The court found the events surrounding the appellee's questioning, despite "the benefit of his parents' involvement," was "custodial in nature" because the appellee "would have `reasonably believed' that he was not free to exit the room or home or otherwise impede the interview."[3] Suppression Court Opinion, 3/22/01 at 6-7. We disagree. Contrast In Interest of Mellott, 327 Pa.Super. 396, 476 A.2d 11, 14 (1984)(circumstances existed showing that the minor-child had reason to believe that his freedom of movement and action had been curtailed to create a custodial environment).
¶ 13 We conclude that the suppression court's findings of fact (i.e., the appellee was a "suspect" and that his statements were "calculated to elicit incriminating statements"[4]) do not support the legal conclusion that the appellee was "in custody" during the police interview. As remarked in Stansbury and Busch, being the "focus" of an investigation does not have talismanic qualities requiring the rendition of Miranda warnings. Rather, it is but one factor in deciding whether one is "in custody." See Mannion, 725 A.2d at 200. Such is not the case here, however, especially given the testimony of the only two witnesses to testify (Detectives Evans and Ruffalo) recounting the appellee's conflicting statements concerning his whereabouts on the evening in question.
¶ 14 We are privy to no record evidence that the police engaged in questioning "calculated to elicit incriminating statements" from the appellee. Quite the contrary, wanting to know someone's whereabouts during the commission of a crime does not automatically translate into a custodial inquisition producing inculpatory statements to the inquisitor. Further, the fact that *982 the interview was conducted in the appellee's home, preceded by the invitation and permission of his parents at the scene, is not to be discounted. Consequently, viewing the facts in toto, we find the court erred in suppressing the appellee's statements as custodial in nature.
¶ 15 Order is reversed. Case is remanded for trial, and jurisdiction is relinquished.
¶ 16 McEWEN, President Judge Emeritus, files a dissenting statement.
McEWEN, President Judge Emeritus, dissenting.
¶ 1 While the majority expression of position provides a persuasive rationale, I am nonetheless obliged to dissent. This Court in Commonwealth v. Zogby, 455 Pa.Super. 621, 689 A.2d 280 (1997), appeal denied, 548 Pa. 658, 698 A.2d 67 (1997), held:
A person is deemed in custodial interrogation if he is placed in a situation in which he reasonably believes that his freedom of action is restricted by the interrogation. Commonwealth v. Williams, 539 Pa. 61, 650 A.2d 420 (1994), Commonwealth v. Brown, 473 Pa. 562, 375 A.2d 1260 (1977). Further, the police officer's subjective intent does not govern the determination but rather the reasonable belief of the individual being interrogated. Id.

Id. at 282 (footnote omitted). The trial judge complied with this mandate and undertook to evaluate the facts and circumstances to determine whether the suspect[5] reasonably believed that he was "free to exit the room or home or otherwise impede the interview." The trial judge then, after considering the evidence presented at the suppression hearing, determined that the suspect did not believe he was free to leave. Since our governing standard of review[6] mandates that we give deference to the factual determinations of the suppression *983 court, I would affirm the order of suppression.
NOTES
[1] The Commonwealth has certified in good faith that the suppression order substantially handicaps and terminates its prosecution of the appellee, V.H. See Commonwealth v. Dugger, 506 Pa. 537, 486 A.2d 382 (1985).
[2] More specifically, Detective Evans testified: "I know that we told them that we needed V.H.'s permission. I don't know if I even told them you don't have to give us permission. I may have told them you can kick me out of your house, if you want to. I don't recall." S.H. 11/14/00 at 26.
[3] Under Stansbury, supra, the reasonable belief of the person being interrogated is of no moment. However, Pennsylvania's standard in custodial interrogation cases evaluating police conduct is more restrictive than that of the Federal Constitution. See Commonwealth v. Mannion, 725 A.2d 196, 201 (Pa.Super. 1999) (en banc), which reaffirmed this distinction and the case-by-case approach to evaluating the existence of a custodial interrogation scenario requiring Miranda warnings.
[4] In contrast to the court's perspective of looking at the appellee's statements being calculated to elicit incriminating remarks, the existence of a "custodial interrogation" requires viewing the facts from the angle of police conduct calculated to, expected to, or likely to evoke admission. See Commonwealth v. Mannion, 725 A.2d 196, 200 (Pa.Super. 1999).
[5] The majority relates that "Pennsylvania law is in harmony with Beckwith [v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976)]." While this statement is quite accurate insofar as Pennsylvania is consistent with the United States Supreme Court's interpretation that Miranda warnings are not required merely because a person is a suspect, it merits mention, as this Court noted in Commonwealth v. Mannion, 725 A.2d 196 (Pa.Super. 1999) (en banc), "that Pennsylvania's standard for police conduct is more restrictive than that of the Federal Constitution." Id. at 201.
[6] Our standard of review of an order granting a suppression motion is well settled:

[W]here a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. Pa.R.Crim.P 323(h). See Commonwealth v. Iannaccio, 505 Pa. 414, 480 A.2d 966 (1984), cert. denied, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985). In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. Commonwealth v. Monarch, 510 Pa. 138, 147, 507 A.2d 74, 78 (1986). If so, we are bound by those findings. Commonwealth v. James, 506 Pa. 526, 533, 486 A.2d 376, 379 (1985). Where as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. Commonwealth v. James, 506 Pa. at 532-33, 486 A.2d at 379; Commonwealth v. Hamlin, 503 Pa. 210, 216, 469 A.2d 137, 139 (1983).
Commonwealth v. DeWitt, 530 Pa. 299, 301, 608 A.2d 1030, 1031 (1992) (footnote omitted). Moreover, if the evidence when so viewed supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusion drawn from those findings. Commonwealth v. Reddix, 355 Pa.Super. 514, 513 A.2d 1041, 1042 (1986).
Commonwealth v. Pitts, 740 A.2d 726, 729 (Pa.Super.1999).