J-A01035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JENNIFER MARIE HALL | : | No. 915 EDA 2023 |

Appeal from the Order Entered March 7, 2023
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0003484-2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E,, and COLINS, J.[*]

DISSENTING MEMORANDUM BY COLINS, J.: **FILED DECEMBER 20, 2024**

I respectfully dissent. In my view, the trial court erroneously imposed a requirement that police officers provide *Miranda*[1] warnings even though the suspect was not subject to a custodial detention. I would reverse the suppression court's grant of Hall's motion to suppress and remand for further proceedings.

The Majority accurately represents the factual and procedural history of this case. *See* Maj. Dec., at 1-4. Furthermore, I agree with the Majority's recitation of our standard of review and the legal framework for our decision. *See id*. at 4-7. However, I disagree with the Majority's conclusion that Hall

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

was subject to the functional equivalent of an arrest at the time she was being interrogated during a routine car stop.

The record supports the conclusion that Hall was subjected to police interrogation. She also was subject to a detention. The question on appeal is whether the detention was investigative or custodial.[2] "In order to trigger the safeguards of **Miranda**, there must be both custody and interrogation." **Commonwealth v. Heggins**, 809 A.2d 908, 914 (Pa. Super. 2002). **Accord Commonwealth v. Yandamuri**, 159 A.3d 503, 520 (Pa. 2017); **Commonwealth v. Turner**, 772 A.2d 970, 973 (Pa. Super. 2001) (*en banc*).

As the Majority notes, there are three levels of police encounters:

…The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a

---

[2] Hall did not argue before the suppression court, nor did the suppression court hold, that the officer's questions went beyond the limits of an investigative detention supported by reasonable suspicion. During argument over the Commonwealth's reconsideration motion, she more directly tied Officer Balatgek's intent to find the illegal drugs to the psychological coercion of her questions. She made the logical leap that the officer's intent turned the detention custodial, which is contrary to the law. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." **Berkemer v. McCarty**, 468 U.S. 420, 442 (1984). Whether the detention became custodial is based on objective factors. **Commonwealth v. Pakacki**, 901 A.2d 983, 987 (Pa. 2006). To the extent that Hall asked the suppression court to make a rule that such psychological coercion, in the form of misleading a detainee during a car stop about the officer's investigative intent, is a "new technique" that should require **Miranda** warnings, **see** N.T. 3/31/23, 12-13, she has not asked us to do so in her brief.

> reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Ellis*, 662 A.2d 1043, 1047–48 (Pa. 1995) (internal citations omitted). As the Pennsylvania Supreme Court explained, "the term 'custodial detention' has generally been used by the United States Supreme Court to describe incidents in which the police do not verbally inform a suspect that he is under arrest, but rather, undertake actions which result in the conditions of the detention becoming so coercive as to amount to the functional equivalent of a formal arrest." *Id*. at 1048 n.3 (internal citation omitted).

The key difference between an investigative and a custodial detention is that the former is temporary and the latter "involve[s] such coercive conditions as to constitute the functional equivalent of an arrest." *Ellis,* 662 A.2d at 1047; *Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023). "The standard … is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized …" and "must be determined with reference to the totality of the circumstances." *Commonwealth v. Pakacki,* 901 A.2d 983, 987 (Pa. 2006) (quoting *Commonwealth v. Edmiston*, 634 A.2d 1078, 1085–86 (Pa. 1993)).

"The usual traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the

conditions and duration of the detention become the functional equivalent of arrest." ***Commonwealth v. Mannion****,* 725 A.2d 196, 202 (Pa. Super. 1999) (*en banc*). "Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for ***Miranda*** purposes." ***Id****.* ***See generally Pennsylvania v. Bruder***, 488 U.S. 9 (1988) (explaining that a traffic stop does not constitute custody for purposes of ***Miranda***).

I believe that the suppression court first, and the Majority in review of the suppression court, erred by assuming custody and looking for factors that would support that determination. The proper starting point is with the well-established proposition that a lawful car stop is an investigatory detention, and a court's review of the record evidence is to determine if, and when, the detention crossed over into the functional equivalent of an arrest. "[P]olice need only give ***Miranda*** warnings while detaining a suspect by the side of a public highway when the suspect [has] actually [been] placed under arrest or when the questioning of the suspect is so prolonged or coercive as to approximate the atmosphere of a station house interrogation." ***Commonwealth v. Toanone***, 553 A.2d 998, 1003 (Pa. Super. 1989). Moreover, "[t]he fact that a police investigation has focused on a particular individual does **not** automatically trigger 'custody,' thus requiring ***Miranda*** warnings." ***Mannion***, 725 A.2d at 200 (emphasis in original).

The factors a court uses to determine whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was

transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. *Mannion*, 725 A.2d at 200. *See also Commonwealth v. Williams*, 650 A.2d 420, 427 (Pa. 1994) (setting out the factors to determine "whether a person is in custody for *Miranda* purposes"); *In re V.H.*, 788 A.2d 976, 980 (Pa. Super. 2001) (similar). "A reviewing court is to consider the particular facts of each case in order to determine whether a detention is custodial." *Mannion*, 725 A.2d. at 201.

Although citing to the "numerous factors" to consider, the suppression court neither discussed them nor weighed them. *See* Trial Court Opinion, 6-7. Instead, the suppression court relied principally on *Commonwealth v. Ingram*, 814 A.2d 264 (Pa. Super. 2002), to support its conclusion that Hall was in custody when interrogated by the officer. Trial Court Opinion, 7-9. In *Ingram*, the officer stopped Ingram on the street, conducted a *Terry* frisk[3] during which he felt an object in Ingram's front pocket, and then asked about it. This Court held that when the officer asked about the object, Ingram "could reasonably believe that his freedom of action was restricted," finding that Ingram "was at that point within the custody of the officers." *Ingram*, 814 A.2d at 271. I note there is a stark difference between *Ingram* and the instant

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

facts, as Hall was never touched by the officers, let alone frisked, before turning over the packets of heroin.[4]

More important than my opinion, however, is the Pennsylvania Supreme Court's opinion in **Pakacki**, where it took a closer look at the facts in **Ingram**. The Court found a show of force in **Ingram** from the "three polices vehicles" that were dispatched to investigate the information that Ingram was in possession of a stolen car and gun. **Pakacki**, 901 A.2d at 986. The three patrol cars "arrived at that location … [t]wo officers asked to speak to [Ingram] about the unauthorized use of a vehicle … [and] informed [him] that they would need to pat him down first and asked him to place his hands on the vehicle and spread his legs." **Id**. Having contrasted the facts before it with those in **Ingram**,[5] the Pennsylvania Supreme Court ruled that the "classic

_____

[4] The driver of the car, here, was frisked, but only after the officer directed him to stand at the back of the car (and not in the direct sightline of Hall). The officer subjected him to a quick and cursory pat down. Unlike in **Ingram**, the driver did not have to place his hands on the vehicle and spread his legs, but rather stood with his arms spread while the officer checked his pockets.

[5] In **Pakacki**, a state trooper, in uniform and marked patrol car, was dispatched to investigate a shooting; he was given Pakacki's name and description as a potential suspect; and he found Pakacki and another man walking on a country road. **Pakacki**, 901 A.2d at 985. "With the lights on his patrol car flashing, [the trooper] pulled over, got out, called [Pakacki] over, asked him if he had any weapons, drugs, or needles, and told him that, for the safety of both of them, he was going to pat him down to ensure he had no weapons." **Id**. As he approached, the trooper smelled marijuana emanating from Pakacki and then, patting him down, "felt what, based on his past experience, he believed to be a marijuana pipe." **Id**. The trooper asked Pakacki "what was in his pocket, and [Pakacki] told him, "I am not going to lie to you, it is a pipe." **Id**. The trooper asked Pakacki to remove the pipe, and
_(Footnote Continued Next Page)_

scenario contemplated by ***Terry***" – a one-to-one confrontation between an officer and Pakacki, a suspect in a shooting – "did not constitute custody." ***Id***. at 988. Because our Court's holding in ***Pakacki*** had "suggest[ed] that any patdown search places a suspect in custody," relying on ***Ingram***, "which is clearly not the law," the Supreme Court reversed and held that Pakacki "was not in custody so as to require ***Miranda*** warnings before the officer asked him about the object in his pocket." ***Id***.

The distinction between ***Pakacki*** and ***Ingram*** is a narrow one based on the number of officers and the manner in which they arrive on scene to confront the suspect on the street. Nevertheless, it is clear that the circumstances presented here are further to the side of finding no custody. The initial stop and confrontation was based on a motor vehicle code violation, not suspicion of illegal gun possession, and was effected at a moment when the officer was outnumbered. The occupants remained in the car speaking with the officer in conversational tones. It was only after this initial conversation, including taking possession of the identification cards, that the numbers of officers on the scene became equal to the number of persons in the car. More significantly, the arrival of the backup officer was not an escalation of the car stop but a wholly typical and usual procedure. Thus,

_____

then placed him under arrest for possession of drug paraphernalia. ***Id***. In all particulars, there were less indicia of custody here than in ***Ingram***, where this Court ruled there was custody, and in ***Pakacki***, except for the later arrival of a second officer, where the Pennsylvania Supreme Court ruled there was no custody.

*Ingram*, as explained by *Pakacki*, does not support the suppression court's ruling in this case. Because I believe the lower court's rationale for finding custody was erroneous, it is necessary to review the *Mannion* factors to determine whether there was a sufficient basis for the ruling.[6]

I start, as does the Majority, with an overview of the video from the officer's body camera. *See* Ex. C-1. In my view it demonstrated that her behavior was not overtly threatening, and her manner of speaking could be described as friendly and informal throughout. She was trying to convince, or even cajole, Hall to admit she possessed a controlled substance, of which the officer had at least reasonable suspicion. This was no doubt interrogation. However, the officer did not raise her voice or speak in angry tones. She asked for Hall's cooperation and offered her own assistance in return, which implicitly indicated that Hall would not be arrested. It did not "approximate the atmosphere of a station house interrogation." *Toanone*, 553 A.2d at 1003.

The basis for the detention was initially a car stop for a motor vehicle code violation and became an investigative detention based on reasonable suspicion of possession of a controlled substance, neither of which are custodial in nature. At 20:58:17, as recorded on the body cam video, the officer began speaking to the occupants asking for a driver's license and related documents. Neither the driver nor Appellee had a driver's license, but

_____

[6] The Majority does not discuss the suppression court's explanation for finding custody, but leaps to an examination of the *Mannion* factors. I infer, therefore, that the Majority also concludes that the suppression court's rationale is erroneous, albeit not its conclusion.

- 8 -

both handed over non-driver's identification cards. At about 20:58:29, the officer explained she knew they lied to her about where they were coming from and said, "I know exactly where you were and what you did." Ex. C-1 at 20:58:44. The officer in fact did know where they had come from and had reasonable suspicion that Hall had purchased a controlled substance at the known drug house. The officer then, in the same informal manner, sought Hall's cooperation with respect to her belief Hall possessed illegal drugs. During an investigative detention "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). *See also Spence*, 290 A.3d at 314; *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019).

The length of the detention at issue was less than eight minutes, from initiation of the car stop until Hall handed over the packets of fentanyl. The video starts at 20:54:29. By 20:54:57, 28 seconds later, a reflection of the dome lights is visible against buildings to the right of the patrol car.[7] At 20:55:07, the patrol car came to a stop and the officer shifts into park. The officer exits the car two seconds later. At 20:55:17, the officer shined her flashlight through the rear driver's side window and three seconds after that

---

[7] *See Commonwealth v. Livingstone*, 174 A.3d 609, 621 (Pa. 2017) (seizure occurs upon "the activation of emergency lights on a police vehicle" because "a reasonable person, innocent of any crime, would … interpret [it] as a signal that he or she is not free to leave").

began speaking to the two occupants. At 21:02:23, less than eight minutes after the initiation of the stop and about seven minutes after the officer began speaking to the occupants of the car, Hall turned over the packets of heroin to the officer.

Eight minutes is a moderate amount of time in the caselaw and in no manner is it *per se* custodial. ***See V.H.***, 788 A.2d at 981 (reversing suppression court and holding that 30- to 40-minute interview by detectives of a juvenile in the juvenile's home while the parents were present was not custody requiring ***Miranda*** warnings). ***See also Williams***, 941 A.2d at 33 (affirming denial of suppression and holding that less than 30 minutes from arrival of officer at scene of accident and provision of ***Miranda*** warnings did not effect a custodial detention where questioning took place in public view); ***Commonwealth v. Sloan***, 303 A.3d 155, 168 (Pa. Super. 2023) (affirming suppression court ruling that defendant was not in custody when interrogated during traffic stop; Sloan remained in own car and the length of interaction was "of short duration," a matter of minutes from a stop for speeding to interrogation).

The amount of time from the initiation of the stop until Hall turned over the packets of heroin was entirely consistent with the time it would have taken to warn the driver that the opaque plastic bag covering the driver's side window was a motor vehicle code violation, collect the required documentation and write a citation, absent reasonable suspicion of illegal drug possession. Here, during the course of the traffic stop the officer asked for, and did not

receive, a driver's license from either the driver or the passenger. Instead, she was given an official form of non-driver's identification from both occupants. Thus, even absent the officer's reasonable suspicion, the traffic stop would have had to be extended to confirm ownership information for the car and to ensure the safety of the car, because neither occupant could drive it away at the end of the stop.[8]

The Majority places great weight on the fact that the officer took the keys to the car and the occupants' identification cards. Maj. Dec. at 8-10. I do not believe that these actions converted the investigatory detention into a custodial detention. **See Sloan**, 303 A.3d at 168 (traffic stop on public highway had not become custodial where trooper's "brief" interrogation began after he had Sloan's license and registration and while Sloan was sitting in his car, neither restrained nor subjected to threats of force). I would agree that

---

[8] In her brief, Hall argues that "both the driver and passenger were questioned well beyond the scope of the purpose for the traffic stop which was a partially covered driver's side window." Appellee's Brief, 12. Hall provides no analysis of the record to support the claim and fails to address both that the occupants did not have a driver's license – thereby necessarily extending the traffic stop – and lied about having come from a known site for illegal drug sales, which plainly provided reasonable suspicion to support an investigative detention for possession of a controlled substance. Hall also asserts that the patrol car with "lights ablaze" and the backup officer "towering over her had all the implicit show of force and the authorization to use it to compel compliance if necessary." **Id**. Neither assertion is persuasive. The first is contrary to **Livingstone**, which holds that the activation of overhead lights effects a detention which could be lawfully supported with reasonable suspicion. **See Livingstone**, 174 A.3d at 621. The number of backup officers at the scene carries weight in the totality of circumstances, but the relative height of an officer to a detainee does not.

in many circumstances taking possession of the car keys would indicate a detention was more than temporary. But, not in these particular circumstances. Seizing the keys, here, was indicative that the officer would not, indeed could not, release the car to the occupants at the end of the stop, and at most indicated what the occupants should already have known: they could not operate a motor vehicle lawfully.[9] *See also Spence*, 290 A.3d at 316 ("custodial detention involves something more than mere exercise of control over the suspect's freedom of movement").

That the officer took possession of the identification cards was part and parcel of a temporary car stop. The Majority finds it significant that the officer "did **not** return to her vehicle to run the information or otherwise confirm vehicle ownership." Maj. Dec. at 8 (emphasis in original). I understand the Majority to be concerned that the officer did not **immediately** return to her car to run the information but continued her investigation by revealing she knew that Hall had lied to her. I do not find it significant that the officer did not immediately complete all of the necessary tasks for the car stop – but turned to the investigation for which she had reasonable suspicion – where, as here, taking the identification cards was not a pretext. The officer testified she later used her in-car computer to check the identification cards and determine if there were any outstanding warrants before returning them to

_____

[9] The Majority notes that the car keys were left on the top of the car "for the duration of the stop." Maj. Dec. at 8. Leaving the keys in the open where another officer can use them to park the car is not coercive.

Hall and the driver and allowing them to leave the scene. N.T. 2/3/23, 20-21. In short, there was nothing about the officer taking possession of the identification cards that converted the continuing detention from a typical car stop into a prolonged custodial detention.

The Majority's reliance on **Commonwealth v. Ochoa**, 304 A.3d 390 (Pa. Super. 2023), "for the proposition that police retaining a defendant's driver's license or identification card is a significant factor to consider when determining whether a reasonable person would feel free to leave," Maj. Dec. at 10-11, is misplaced as that case only concerned whether the detainee was free to go, and thus whether consent could be freely given, and did not distinguish an investigative detention from a custodial detention, which is the question before us. **Ochoa**, 304 A.3d 398-399. Retaining the identifications in this case was a necessary and usual function of a lawful car stop, which this was, and did not increase the coercive effect of the officer's conduct, at least not to the functional equivalent of an arrest. Moreover, the officer had reasonable suspicion to investigate Hall for possessing a controlled substance by this point and could lawfully extend the detention in order to dispel that suspicion. **Sloan**, 303 A.3d at 166 ("we conclude that, under the totality of the circumstances, and before the initial stop's purpose had been fulfilled, reasonable suspicion arose such that Trooper Rowe was permitted to investigate his new suspicions of DUI").

The remaining **Mannion** factors demonstrate that the line over which a temporary investigative detention becomes custodial was not crossed. The

location of the stop was on a public street. Hall remained in the passenger seat of the car for the entirety of the relevant time, during which she opened her passenger side door. She was not transported anywhere, and no restraints were used. In fact, Hall was allowed to leave after the officer's investigation had ended. N.T. 2/3/23, 21. These factors militate against finding custody. Further, there was no overt show of force by the officers. Though both officers were in uniform and both were armed, their guns were never drawn. This level of coercion is present in the typical car stop without converting it into the functional equivalent of arrest. *See Sloan*, 303 A.3d at 168 (asking where marijuana was located did not require *Miranda* warnings because detention had not become custodial where traffic stop was on the side of a public road, Sloan was sitting in his own car and he was neither restrained nor subjected to threats of force); *Commonwealth v. Proctor*, 657 A.2d 8, 11–12 (Pa. Super. 1995) (defendant-motorist not in custody when detained at an accident scene for a short time to permit the officer to complete investigation and conduct a field sobriety test because defendant's freedom of movement was not inhibited in any significant way); *Commonwealth v. Haupt*, 567 A.2d 1074, 1080 (Pa. Super. 1989) (holding that detention was not custodial where initial basis was a traffic violation, the stop lasted approximately 15 to 20 minutes, the location was a public street, the defendant-motorist was not transported anywhere, no restraints were used and the police officer made no show, threat or use of force).

The arrival of a backup officer also was not a significant factor towards converting the traffic stop into a custodial detention. It is the norm for an officer to radio for backup when making a car stop. As there were two occupants in the car, the backup officer only evened the numbers during the nighttime car stop.[10] The questions asked of the occupants of the car were

_____

[10] In a non-precedential decision, which I find persuasive on this point in accordance with Pa.R.A.P. 126(b), a panel of this Court reversed a suppression order that specifically relied on the arrival of three additional officers to rule that a traffic stop had become custodial. **See Commonwealth v. Priovolos**, 884 EDA 2020, 2020 WL 7353816, *7 (Pa. Super., filed Dec. 15, 2020):

> Instantly, our review of the record in this matter reveals that appellee's statements to police prior to his formal arrest were admissible without **Miranda** warnings, as they were made during the course of an investigatory detention, and not a custodial interrogation. The suppression court's determination that the arrival of Officers Menzies, Aita, and Sergeant Gothenburg at the scene of the traffic stop elevated appellee's interaction with police to a custodial interrogation is unsupported by the record. Viewed under a totality of the circumstances, the record establishes that appellee was subject to an investigatory detention during a routine traffic stop in a public parking lot, and Officer Crescenzo made reasonable investigative inquiries after observing several indicators of intoxication. During the course of this investigation, appellee was never placed in handcuffs, transported to another location against his will, or subjected to investigative methods beyond routine field sobriety testing and questioning by Officers Crescenzo and Menzies. The mere arrival of three additional officers to the scene of the traffic stop, in and of itself, did not create what the suppression court characterized as a "police-dominated atmosphere" nor subject appellee to "prolonged or coercive ... interrogation," thereby elevating the encounter to a custodial interrogation. **See Toanone**, 553 A.2d at 1003.

**Id.** (internal citations to the record omitted).

directed to dispelling or confirming the officer's reasonable suspicion in an efficient manner.

Therefore, after a comprehensive review of the **Mannion** factors, I would find that Hall was not subject to a custodial detention at the time the officer began questioning her. I would also find erroneous the suppression court's alternative ruling that "[e]ven if the Appellee was not entitled to be **Mirandized** before the first question, after Appellee stated she had two bags, … Officer Balatgek should have advised the Appellee of her **Miranda** warning before asking where the drugs were." Trial Court Opinion, 12. With respect to whether the detention was custodial, literally nothing had changed from before the Officer asked "Alright honey, what do you got on you?" until the officer asked where the drugs were. The coercive nature of the situation had not changed, not even the volume or tenor of the officer's voice. The public nature of the detention had not changed. Hall's location had not changed, and she had yet to be touched by the officer. That the officer undeniably had probable cause at this point from the driver's confirmation of Hall's illegal drug possession only meant she could lawfully arrest Hall at that point, not that she had to.

There was just one more question added to the interrogation. But, as stated above, both I and the Majority assume that the officer's questions constituted interrogation. The only issue before us is whether the detention was custodial, because only when there is custody and interrogation are **Miranda** warnings required. **Yandamuri**, 159 A.3d at 520; **Turner**, 772 A.2d

at 973. Interrogation without custody does not require **_Miranda_** warnings. **_See Heggins_**, 809 A.2d at 914 (to trigger the safeguards of **_Miranda,_** there must be both custody and interrogation). It follows that interrogation plus more interrogation without custody does not require **_Miranda_** warnings.[11]

For these reasons, I would reverse the suppression court and remand for further proceedings.

_____

[11] To be clear, I am not saying that an extended interrogation or a change in the tenor of the questioning could never equate to custody. Only that the few additional seconds to ask the final question without any other material change as happened here did not make the detention custodial.